AO 91 (Rev. 11/11) Criminal Complaint                    Trial Attorney Victor B. Yanz (202) 957-2993

**FILED**
9/12/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER: 23 CR 485 |
| v. | **UNDER SEAL** |
| OSCAR H. ALVARADO | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about November 29, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant OSCAR H. ALVARADO violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1343 | Having devised and intending to devise a scheme to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme, did cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely an electronic submission of a request for reimbursement for COVID-19 testing of minor patient T.P. to the Health Resources and Services Administration |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

*s/ Christa Varga*
Christa Varga
Special Agent
Federal Bureau of Investigation

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: September 12, 2023

*Judge's signature*

City and state: Chicago, Illinois

JEFFREY I. CUMMINGS, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, CHRISTA VARGA, being duly sworn, state as follows:

## I.     INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been so employed since approximately June 2021. I am currently assigned to the FBI's Health Care Fraud Squad in Chicago, Illinois. As part of my official duties, I investigate violations of federal criminal law, including criminal violations relating to wire fraud.

2.      This affidavit is submitted in support of a criminal complaint alleging that OSCAR H. ALVARADO has violated Title 18, United States Code, Section 1343, in connection with a COVID-19 ("COVID") test collection site he operated in Chicago, Illinois. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging OSCAR H. ALVARADO with committing wire fraud, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that OSCAR H. ALVARADO committed the offense alleged in the complaint.

3.      This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, interviews with witnesses, banking records obtained from financial institutions, and various other business records, as described herein.

## II.    BACKGROUND ON COVID TESTING CLAIMS PROCESSED THROUGH THE HEALTH RESOURCES AND SERVICES ADMINISTRATION

4.    The Health Resources and Services Administration ("HRSA") is an agency of the U.S. Department of Health and Human Services ("HHS") that provides health-related programs to support, among other groups, children and people with low income. Several of the programs HRSA provides relate to public access to COVID testing.

5.    The Centers for Medicare and Medicaid Services ("CMS") regulate all laboratory testing (except research) performed on humans in the United States through the Clinical Laboratory Improvement Amendment ("CLIA"), according to CMS.gov.

6.    From interviews regarding this and other investigations into COVID-related fraud, investigators are aware that during the COVID pandemic, many individuals were tested for COVID through various methods. One of these methods was to go to an independent COVID testing site, where tests were generally administered by employees at the site.  As testing developed and became widely available, many new COVID testing sites were established due to significant demand.

7.    Testing sites used different processes to administer tests and notify patients of results, depending on the type of test. Rapid testing could be completed on-site, and results were processed within minutes and provided to patients by testing-site employees. Alternatively, polymerase chain reaction ("PCR") testing required a lab to process the tests, and often took days to generate results.

8.     Testing sites collected test specimens from patients at designated testing locations, as well as at patients' homes and elsewhere in the community, and the specimens would then be tested by a lab. The PCR test specimens would be collected by testing site employees, or by outside collectors, and would be delivered to a CLIA-certified COVID testing lab. Generally, the PCR test specimens would include corresponding patient data and contact information, such as a patient email address, where test results could later be sent, and patient insurance information. After generating test results, a lab would communicate the results to the patient, using the contact information the patient provided at the time of testing, and subsequently submitted claims for reimbursement to the patients' health insurer, or, if the patient was uninsured, to HRSA.

9.     Regardless of the type of test administered, the testing sites themselves could not bill HRSA directly; instead, HRSA required billing to go through a lab with a certified CLIA number. In addition to billing HRSA for PCR tests, CLIA-certified labs could also bill HRSA for Rapid tests conducted at testing sites. However, because the testing sites administered Rapid tests and delivered immediate results to patients, there was no need to maintain or provide the physical testing materials to the CLIA-certified labs; instead, the sites simply provided to the labs logs of Rapid tests administered, and the labs used the logs for billing purposes.

10.     HRSA, through its uninsured program ("HRSA Uninsured Program"), reimbursed laboratories that processed COVID tests for uninsured individuals. Since March 2020, several legislative acts designed to provide financial assistance and reimbursements to health care providers, including laboratories (collectively,

"providers"), treating uninsured individuals during the COVID pandemic have been passed by Congress and signed into law, including the following:

      a.    In March 2020, the Families First Coronavirus Response Act provided $1 billion to the Public Health and Social Services Emergency Fund ("PHSSEF"), to be managed by HHS, for reimbursement to hospitals and other providers for COVID-related treatment and visits of uninsured individuals;

      b.    In March 2020, the Coronavirus Aid, Relief, and Economic Security Act appropriated $100 billion to the PHSSEF to reimburse eligible providers for health care related expenses or lost revenues that are attributable to COVID;

      c.    In April 2020, the Paycheck Protection Program and Health Care Enhancement Act appropriated $1 billion to the PHSSEF "to cover the cost of testing for the uninsured"; and

      d.    In March 2021, the American Rescue Plan Act of 2021 appropriated $4.8 billion in funds to support the continued reimbursement to "providers for testing uninsured individuals for COVID" (collectively, the "Funds").

11.    HRSA oversees and administers the Funds. HRSA established a single electronic claims processing system for providers to submit claims for reimbursement for diagnostic testing and treating uninsured individuals from the Funds. Tests were generally reimbursed by the HRSA Uninsured Program at the same rates Medicare reimbursed providers for COVID tests provided to beneficiaries.

12.    In order to receive reimbursement for COVID testing through the HRSA Uninsured Program, providers must attest to compliance with the Terms and Conditions for Participation in the HRSA Uninsured Program ("HRSA Program

Terms and Conditions"). Providers must acknowledge each time they submit a claim for reimbursement for COVID testing and/or testing-related items and services provided to uninsured individuals that the claim is in full compliance with the HRSA Program Terms and Conditions.

13.     The HRSA Program Terms and Conditions define COVID testing as an in vitro diagnostic test for the detection of SARS-COV-2 or the diagnosis of the virus that causes COVID, and the administration of such test, that meets certain requirements, such as being approved by the U.S. Food and Drug Administration ("FDA") or authorized by the FDA for emergency use.

14.     Providers who attest to the HRSA Program Terms and Conditions make certifications that include, but are not limited to:

        a.     The provider or its agents provided the items and services on the claim form, to the uninsured individuals identified on the claim form, on or after February 4, 2020, and all items and services for which payment is sought were medically necessary;

        b.     To the best of the provider's knowledge, the patients identified on the claim form were uninsured individuals at the time the service was provided;

        c.     The provider will not use the payment from the HRSA Uninsured Program to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse;

        d.     The provider will not engage in "balance billing" or charge any type of cost sharing for any items or services provided to uninsured individuals receiving COVID testing and/or testing-related items for which the provider receives

a payment from the HRSA Uninsured Program. The provider "shall consider Payment received from the [HRSA Uninsured Program] to be payment in full for such COVID-19 testing and/or testing-related items"; and

e. The provider will maintain appropriate records and documentation required to substantiate payments, and will promptly submit copies of such records and documentation upon request of appropriate regulators.

15. To claim reimbursement for COVID testing of uninsured individuals, COVID testing labs must submit patient rosters to HRSA. This is done through HRSA's online web portal – a process which utilizes interstate wire communications. This can be done on an individual patient basis or in batches. To document patient eligibility, providers must submit unique identifiable information about uninsured individuals, including the patient's name, date of birth, and gender. The HRSA Uninsured Program further requires the patient's social security number and state of residence, or state identification / driver's license, in order to verify patient eligibility. If a patient's social security number, state of residence, or state identification / driver's license is not submitted, the provider must attest that they attempted to capture this information before submitting a claim and the patient did not have this information at the time of service, or that the provider did not have direct contact with the patient and thus did not have an opportunity to attempt to capture this information.

16. Each time a provider adds either an individual patient or a batch of patients to their roster, the provider is required to attest to the following:

      a.    The provider has read and agrees to the applicable HRSA Program Terms and Conditions;

      b.    The provider has checked for health care coverage eligibility and confirmed the patient is uninsured; does not have employer-sponsored or individual coverage, Medicare, or Medicaid; and no other payer will reimburse for COVID testing or care for the patient;

      c.    The provider agrees to accept the defined program reimbursement, as determined by HRSA, as payment in full, and will not balance bill the patient; and

      d.    The provider agrees to program terms and conditions and to be subject to post-reimbursement audit review.

17.    HRSA reimbursed CLIA-certified labs directly for the processing of COVID tests. From interviews regarding this and other investigations into COVID-related fraud, investigators also learned that, in order to stay competitive, COVID testing labs would often pay the testing sites for PCR test specimens and Rapid test logs at the time the tests and logs were delivered to the lab – which was before the lab had run the PCR tests, and before it had been reimbursed by HRSA or an insurance company.

18.    Due to lack of funding, HRSA stopped accepting claims for the COVID testing of uninsured individuals after March 22, 2022. However, certain claims for COVID testing continued to be reimbursed by Medicare, Medicaid, and private insurers. These insurance programs, whether public or private, do not reimburse medical providers for services not actually rendered.

### III.    FACTS SUPPORTING PROBABLE CAUSE

#### A.  SUMMARY OF PROBABLE CAUSE

19.    The United States Department of Justice, FBI, and HHS-Office of Inspector General are investigating allegations of fraud related to COVID testing. The investigation thus far has revealed that, at ALVARADO's direction, employees at ALVARADO's COVID testing site, located at 6532 S. Ashland Ave., 1st Floor, Chicago, Illinois ("ALVARADO's Site") falsified PCR tests and test-collection kits, as well as records, to support billing for COVID tests by CLIA-certified laboratories that were purportedly administered to uninsured individuals, including minors such as minor patient T.P., who did not receive the tests and/or do not exist.    The investigation has revealed that ALVARADO delivered these falsified tests, test-collection kits, and records to various COVID testing laboratories, including LABORATORY 1, and was paid by the testing laboratories for them. The laboratories then submitted claims for reimbursement to the HRSA Uninsured Program, via interstate wire communications, for PCR tests performed on the test-collection kits and for Rapid tests purportedly performed at ALVARADO's Site based on records provided by ALVARADO and others, and were reimbursed for the fraudulent tests.

20.    According to witness interviews, surveillance, and records obtained by law enforcement, federal agents learned that, from approximately May 2021 to at least May 11, 2023, ALVARADO operated ALVARADO's Site. ALVARADO also lived in an apartment located directly above ALVARADO's Site. ALVARADO's employees collected COVID test samples in two ways: from patients on-site at ALVARADO's Site, or by taking test-collection kits into the community and administering tests to

patients off-site. Off-site employees would then transfer the completed test-collection kits to ALVARADO's Site, where ALVARADO or one of his employees would transport the test-collection kits to labs, including LABORATORY 1, for processing. The labs would bill HRSA or other health insurance programs for these tests.

21. ALVARADO regularly delivered fraudulent tests, test-collection kits, and records to the labs, knowing the labs would submit claims to HRSA and other health insurance programs for reimbursement, and sought reimbursement from the labs for delivering them. The claims that ALVARADO caused the labs to submit were fraudulent because the patients whose information was associated with the test-collection kits and purported Rapid tests did not, in fact, take the tests, and/or because those purported patients did not exist.

## B. BACKGROUND REGARDING ALVARADO'S TESTING SITE

22. From approximately May 2021 to at least May 11, 2023, ALVARADO operated ALVARADO's Site. A Google search indicates that an entity called "Center for COVID Care" is located at 6532 S. Ashland Ave, Chicago, Illinois (i.e., the building that houses ALVARADO's Site on the first floor). Google reviews for this entity include an entry from an "Oscar Alvarado" in approximately October 2021 stating that the location is "Excellent, Fast, Friendly and Professional service. Great people too!" Law enforcement searches for registration and incorporation records with the Illinois Secretary of State ("IL SOS") for the ALVARADO's Site have yielded no results. On multiple occasions between April 4, 2022, and August 23, 2023, law enforcement observed a vehicle parked behind ALVARADO's Site that was registered to an individual named Oscar Alvarado, with a registered address of 6532 S. Ashland

Ave., 2nd Floor, Chicago, IL 60636. On September 16, 2022, investigators observed ALVARADO departing 6532 S. Ashland Ave., Chicago, IL in this vehicle.[1]

23. Based on a review of records obtained from LABORATORY 1, many of the PCR tests and Rapid test logs listed "covidtestplus@gmail.com" as the email address of the purported patients who submitted to testing through ALVARADO's Site. Google and Comcast records indicate that ALVARADO and individuals who worked for him were linked to this email address. In particular, information obtained from Google revealed that covidtestplus@gmail.com was created on July 29, 2021, and the subscriber name on the covidtestplus@gmail.com account was Oscar Alvarado. Google records also listed two of ALVARADO's employees – INDIVIDUAL 1 and INDIVIDUAL 2 – under billing information for the covidtestplus@gmail.com account. IP address information obtained from Comcast shows that the covidtestplus@gmail.com account was accessed by Comcast accounts associated with ALVARADO and INDIVIDUAL 3, another of ALVARADO's employees.

24. A review of ALVARADO's bank records shows checks written from ALVARADO's Bank of America account x1951 ("ALVARADO's Account") to numerous employees, including INDIVIDUAL 1, INDIVIDUAL 2, and INDIVIDUAL 3, with "Payroll" listed in the memo line. Agents also reviewed records from JP Morgan Chase for account ending in x8049 ("JPMC x8049"), which lists the owner as INDIVIDUAL 4.[2] Additionally, ALVARADO is listed as a payee on that account.

---

[1] Agents visually identified ALVARADO as the same individual depicted in his driver's license photograph.

[2] Based on public records, as well as references and photographs on ALVARADO's social media account, investigators believe INDIVIDUAL 4 to be a family member of ALVARADO.

Between August 9, 2021, and March 14, 2022, there was an approximate combined total of $400,220 in payments from LABORATORY 1 deposited into ALVARADO's Account and JPMC x8049.

### C. INTERVIEWS OF ALVARADO'S EMPLOYEES

25.     Federal investigators conducted interviews of individuals who worked for ALVARADO at ALVARADO's Site. These witnesses provided information about fraudulent activities at the ALVARADO's Site, as summarized below:

### i.     WITNESS 1

26.     In an interview with federal investigators, WITNESS 1 advised that he/she worked for ALVARADO from May or June 2021 to December 2021, and again for a few weeks in or around the summer of 2022.[3]

27.     WITNESS 1 stated that he/she started out making $5 per test from ALVARADO when he/she recruited patients to take COVID tests or provide specimens at ALVARADO's Site. Later on, WITNESS 1 administered PCR tests to patients outside ALVARADO's Site. WITNESS 1 was initially paid $10 per test, and was later paid $15 per test by ALVARADO. WITNESS 1 stated that ALVARADO told him/her to start creating fictitious children under the names of real adult patients who had received tests in the past. WITNESS 1 advised that he/she did create the names of fictious minor patients to be associated with real adult patients and created fraudulent COVID specimens for those fictitious minor patients. WITNESS 1 stated

---

[3] WITNESS 1 has criminal convictions for the following offenses: retail theft (2008); possession of cannabis (2005); possession of a controlled substance (2003); forgery (2001); burglary (1997); and aggravated battery (1995).

that he/she created fictitious adult COVID test kits as well. WITNESS 1 created specimens for fictitious test kits by swabbing his/her own nose. WITNESS 1 also advised that pre-made swabs created by WITNESS 1 and another employee, previously referenced in this Affidavit as INDIVIDUAL 1, were kept in a refrigerator at ALVARADO's Site, which were used in making fraudulent test kits.

28.     WITNESS 1 also stated that other individuals worked under him/her, and those individuals also administered tests in the community. WITNESS 1 taught those individuals to also create fraudulent tests associated with fake minor patients. WITNESS 1 paid these individuals $4 or $5 per test created or collected in the community. WITNESS 1 advised that many of the patients were real people; however, many fictitious specimens were placed in tubes under the real patients' names. According to WITNESS 1, tests conducted on children did not require an identification card for the minor person. ALVARADO instructed employees to create fictitious children's names using the last name and home address of an actual patient who received a COVID test. When WITNESS 1 first started working for ALVARADO, ALVARADO would allow employees to create three to four fictitious children names per adult photo identification. Later, ALVARADO told WITNESS 1 and other employees to create only two fictitious children's names per adult photo identification.[4]

---

[4] Agents reviewed records associated with ALVARADO's Site and found numerous suspicious examples of minors who purportedly submitted to PCR tests with adults. For instance, according to these records, Purported Patient 2, an adult referenced later in this affidavit, had the names of 20 different minors associated with his/her identification card, all of whom were represented to have taken COVID tests through ALVARADO's Site.

29.     WITNESS 1 was charged $20 by ALVARADO if a test came back inconclusive. A test was inconclusive if the test was missing information or if the swab did not have enough mucus for the lab to process the test. When WITNESS 1 first started working for ALVARADO, he/she was paid daily by check. However, later, WITNESS 1 was paid in cash every two weeks.

30.     According to WITNESS 1, ALVARADO had employees conducting "outside" COVID tests in the community and "inside" COVID tests at ALVARADO's Site. WITNESS 1's job responsibilities were to conduct "outside" tests and to refer patients to get tested at ALVARADO's Site. WITNESS 1 stated that when he/she collected tests, there was a sign-in sheet which WITNESS 1 brought to ALVARADO's Site. Sometimes WITNESS 1 would enter patient information into a computer at ALVARADO's Site, and sometimes other employees at ALVARADO's Site would do so. WITNESS 1 stated that, after collecting test specimens in the community, he/she brought the specimens to ALVARADO's Site. In addition, WITNESS 1 stated that he/she would use a cell phone to take pictures of patients' identification cards, and then print those cards from the office printer at ALVARADO's Site. Each completed test kit included a test specimen and a copy of the patient's photo identification. Employees at ALVARADO's Site would make two copies of identification cards: one for the envelope and one to be kept at ALVARADO's Site. WITNESS 1 provided investigators with photographs of sign in-sheets at ALVARADO's Site.

### ii.     WITNESS 2

31.     WITNESS 2 told agents that he/she worked as an "inside" employee for ALVARADO from September 2021 to August 2022. WITNESS 2's main responsibility

was to collect test specimens from patients at ALVARADO's Site to complete PCR test kits. WITNESS 2 was paid $5 per test kit. WITNESS 2 stated that patients were also paid $5 for each test completed. WITNESS 2 gave patients PCR kits for COVID tests, as well as registration forms. WITNESS 2 gave instructions to patients to complete the registration forms, which asked for the patient's name, date of birth, and email address. WITNESS 2 would instruct the patients to swab themselves and place the swab inside the tubes. WITNESS 2 would then take the completed tube and registration form and place them inside of a bag. This bag was then placed into a basket next to his/her desk and moved to a larger basket at the end of the day, so it could be collected and taken to the lab.

32.   WITNESS 2 stated that he/she was trained by INDIVIDUAL 1. According to WITNESS 2, INDIVIDUAL 1 instructed WITNESS 2 to add three to four children's names for each real adult PCR COVID specimen collected. INDIVIDUAL 1 told WITNESS 2 that, in order to create fake children's specimens, WITNESS 2 would need to swab his/her own nose or own gums and place those swabs into specimen tubes with labels on the tubes with fake children's names, and that that he/she could make more money by using this method.

33.   WITNESS 2 stated that ALVARADO also instructed WITNESS 2 to create test kits using fake children names. WITNESS 2 told ALVARADO that INDIVIDUAL 1 had already told him/her about this scheme. ALVARADO told WITNESS 2 that if he/she created test kits with fake children's names, he/she could make more money. WITNESS 2 stated that he/she told ALVARADO he/she was not

interested in creating tests for fake children, and that in fact he/she did not create fake children's names or fake specimens.

34.     WITNESS 2 stated that it was ALVARADO's policy to collect more than one test kit from a patient at the same time and submit the test kits to multiple different labs. One test kit required a nasal swab and the other required an oral swab. If two test kits were completed, then the patient and collecting employee would each receive $10, according to WITNESS 2. WITNESS 2 explained that when the test kits were completed, each test would go into a different basket, depending on which lab the test kit would go to for processing. WITNESS 2 entered the patient's name on a log, along with how much the patient was paid for each test kit. WITNESS 2 stated that when he/she first began working at ALVARADO's Site, these logs were collected by ALVARADO, but, that later, the logs were collected by another employee. Later, these logs were maintained electronically, and the patient information would have to be entered into a computer at ALVARADO's Site or on a personal electronic device. One of the pieces of information patients were required to provide was an email address. If the patient didn't have an email address, WITNESS 2 would enter "covidtestplus@gmail.com" as the email address.

35.     When ALVARADO was in the country, ALVARADO would drop off all test kits to the labs, including LABORATORY 1. When ALVARADO was out of the country, WITNESS 2 dropped off test kits to LABORTORY 1 and another lab. ALVARADO showed WITNESS 2 how and when to drop of the samples at LABORATORY 1 and the other lab.

### iii.   WITNESS 3

36.    WITNESS 3 advised he/she began working for ALVARADO in December 2021. WITNESS 3 worked mostly as an outside employee administering tests and collecting test kits from family and friends. WITNESS 3 also worked for a short period of time at ALVARADO's Site, at the request of ALVARADO, in February and April 2023. WITNESS 3 stated that he/she was paid $300 per day when working in the office. WITNESS 3 stated that all types of insurance were accepted at ALVARADO's Site, including private insurance, Medicare, and Medicaid. WITNESS 3 stated that patients would receive $5 or $10 for providing specimens for PCR test kits. WITNESS 3 stated he/she would only pay children and not adults to provide specimens.

37.    WITNESS 3 stated that he/she got paid between $5 and $20 per test he/she administered outside of the office for ALVARADO's Site, depending on which lab processed the test. WITNESS 3 stated that when he/she first started working for ALVARADO he/she was paid in cash, but later on he/she was paid by cash or check.

38.    WITNESS 3 stated that medical insurance information was not required for COVID tests until approximately March 2022.[5]  In the time before insurance was required, ALVRADO had told WITNESS 3 to collect two specimens from each patient on the same visit. WITNESS 3 stated he/she was paid for collecting each specimen.

39.    WITNESS 3 stated that after he/she dropped off test kits at ALVARADO's Site, the test kits would get logged into a computer system. WITNESS 3's name would then be logged on a paper list, along with the number of test kits that

---

[5] As noted above, the HRSA Uninsured Program stopped accepting claims after March 22, 2022, due to insufficient funds.

he/she had brought in that day. WITNESS 3 showed the agents a picture of one of the paper tracking sheets.

40.     WITNESS 3 stated that before insurance was required, he/she would upload the adult's IDs and then use that for all the patient's children as well because children do not have their own IDs. Once insurance was required, the children needed insurance just like the adults.

### iv.     INDIVIDUAL 2

41.     Another employee, referenced previously in this Affidavit as INDIVIDUAL 2, stated that he/she worked at ALVARADO's Site between the summer of 2021 and February or March 2022.[6] According to INDIVIDUAL 2, he/she was required to collect identification information from adults prior to collecting a specimen for a PCR test, but the same was not true of minor test recipients. INDIVIDUAL 2 stated that he/she created false test kits for minors by swabbing his/her own nose. INDIVIDUAL 2 stated that he/she believed INDIVIDUAL 1 came up with the scheme of creating fake test kits attributable to purported minors, but that ALVARADO was aware of the scheme and provided guidance regarding how to do it without raising suspicion. In particular, ALVARADO told INDIVIDUAL 2 and INDIVIDUAL 1 not to add more than four test kits for purported minors, and that submitting more than four such test kits would look dubious to auditors. ALVARADO also instructed INDIVIDUAL 2 and the other employee to make it look like the adult

---

[6] INDIVIDUAL 2 has criminal convictions for the following offenses: identity theft, possession of a controlled substance, and manufacture/delivery of cannabis, all from 2019; and possession of a controlled substance from 2003.

who actually completed the COVID test kit was a parent of the fake children whose test kits were included fraudulently. This was accomplished by using the adult's address information for the fake children.

### D. LABORATORY 1 AND LABORATORY 2

42.     According to IL SOS records, LABORATORY 1 was incorporated on March 1, 2006. Through interviews with a former executive at the company, investigators learned that LABORATORY 1 began by conducting various toxicology and lab services. The former executive, while at LABORATORY 1, also created a company that managed patient and testing data of laboratories. When he/she separated from LABORATORY 1 in 2016, the former executive retained the data management company. Thereafter, the data management company began managing the data for COVID testing at LABORATORY 1 and at another testing laboratory, LABORATORY 2.

43.     Through subpoena returns, investigators learned that the same billing company handled submitting testing claims to insurance companies for both LABORATORY 1 and LABORATORY 2. An interview of the billing company owner revealed that representatives from LABORATORY 1 and LABORATORY 2 would upload testing data to the data management company, which would then make the data accessible to the billing company. The billing company would format the spreadsheet and would then submit the testing claims to different insurers for reimbursement, including HRSA.

44.     According to HRSA data published by the Centers for Disease Control and Prevention, LABORATORY 1 received over $187 million in HRSA funds for

claims seeking reimbursement for COVID testing, while LABORATORY 2 received over $152 million in HRSA funds.[7]

## E. INTERVIEW OF LABORATORY 1 EMPLOYEE

45.     Federal investigators also interviewed WITNESS 4, an employee of LABORATORY 1. WITNESS 4 stated that his/her main responsibility at LABORATORY 1 was working with "collection agents," a term used to describe COVID testing sites and other entities that brought PCR test specimens to LABORATORY 1 for processing. WITNESS 4's tasks included reviewing LABORATORY 1's collection agent contracts with collection agents, accepting PCR samples from collection agents, ensuring collection agents had proper training, and paying collection agents.

46.     WITNESS 4 stated that ALVARADO signed a collection agent contract with LABORATORY 1. WITNESS 4 stated that ALVARADO had multiple trainings provided by LABORATORY 1 on how to properly collect specimens for PCR testing, how to properly store PCR samples, and what information was needed in order for the lab to process tests.

47.     WITNESS 4 stated that when ALVARADO first started, he brought 20 to 30 samples per day to LABORATORY 1; however, in October or November 2021, the number of samples ALVARADO brought to LABORATORY 1 increased to 150 to 200 samples per day.

---

[7] *See* https://data.cdc.gov/Administrative/Claims-Reimbursement-to-Health-Care-Providers-and-/rksx-33p3/ data (last visited on May 11, 2023).

48.     WITNESS 4 stated that, to the best of his/her knowledge, ALVARADO was not working with another lab. WITNESS 4 stated that LABORATORY 1 did not allow its collectors to work with other labs.[8]

49.     WITNESS 4 stated that patients whose tests were processed through LABORATORY 1 received their results by email. WITNESS 4 stated when ALVARADO first started submitting tests, collection agents were required to provide patient information by paper, along with the collected sample tube. This patient information would include a copy of photo identification of the patient. In July 2021, LABORATORY 1 changed to an electronic system of documentation for the tests. WITNESS 4 stated that if a copy of photo identification was not provided with the test samples, those samples were not processed. WITNESS 4 stated that tests processed for children required the photo identification of a parent or guardian.

50.     WITNESS 4 stated that COVID test kits that came from ALVARADO's Site were entered as "OSCAR" in the collection agent field in LABORATORY 1's computer system. WITNESS 4 stated that he/she recalled two individuals dropping off test kits from ALVARADO's Site to LABORATORY 1: ALVARADO and an unnamed individual whose physical description by WITNESS 4 is consistent with WITNESS 2. That second individual dropped off test kits when ALVARADO was out of the country, according to WITNESS 4.

---

[8] As noted previously, interviews with ALVARADO's employees indicate that ALVARADO was, in fact, working with multiple labs.

### F. USE OF COVIDTESTPLUS@GMAIL.COM

51. The investigation revealed that ALVARADO trained his employees to input "covidtestplus@gmail.com" as a patient's email address if no email address was provided at the time the specimen was collected. Information obtained from the data management company that LABORATORY 1 used for COVID testing data shows that one of the collection agents in LABORATORY 1's system is labeled as "OSCAR," which WITNESS 4 advised meant ALVARADO's Site. A significant number of tests attributed to ALVARADO's Site listed covidtestplus@gmail.com as the patients' contact email address. More specifically, LABORATORY 1 data from its data management company ("LABORATORY 1 data") indicated that, between May 10, 2021, and January 20, 2022, LABORATORY 1 processed approximately 15,214 COVID tests from ALVARADO's Site. Of those tests, approximately 6,400 listed covidtestplus@gmail.com as the contact email address for the patient – this is approximately 40% of the total of LABORATORY 1's tests from ALVARADO's Site.

52. In addition, approximately 5,898 of the test kits collected from ALVARADO's Site were attributed to patients who were represented to be minors at the time of the purported testing—this is approximately 38% of the total of LABORATORY 1's tests from ALVARADO's Site.[9] Furthermore, LABORATORY 1 data shows that, for 2,056 of the 5,898 tests for minor patients, the patients used covidtestplus@gmail.com as their contact email address.

---

[9] These numbers were based on sorting for dates of birth which were February 2004 or earlier. The last test was submitted, per the LABORATORY 1 data, in January 2022. Therefore, children born after February 2004 or earlier would have been minors at that time.

### G. INTERVIEWS OF ALVARADO'S PURPORTED PATIENTS

53. Federal investigators interviewed several individuals from LABORATORY 1's list of patients who purportedly received COVID tests through ALVARADO's Site. These witnesses' interviews are summarized below:

i. Purported Patient 1 ("PP1") stated that, although he/she received approximately seven tests for COVID, he/she received none of those tests at or through ALVARADO's Site. LABORATORY 1 data showed a total of 46 tests that were purportedly administered using PP1's driver's license number for identification between September 16, 2021, and January 6, 2022, at, or from, ALVARADO's Site.[10] Of those tests, 12 were listed in PP1's name and 34 tests were affiliated with purported minor patients. 14 of the 46 tests listed covidtestplus@gmail.com as the patient contact email address. PP1 stated that he/she did not recognize the names of the minor children listed as receiving tests under her/his identification information. PP1 stated that he/she has five children, all of whom are adults, and provided their names. None of their names appeared on the list of individuals in the LABORATORY 1 data under PP1's identification information. PP1 further stated that he/she did not use covidtestplus@gmail.com or any of the other email addresses that were listed as PP1's contact email address.

ii. Purported Patient 2 ("PP2") stated that, although he/she received several tests for COVID, he/she received none of those tests at, or through, ALVARADO's Site. LABORATORY 1 data showed a total of 47 tests that were

_____

[10] Several digits in the driver's license number listed under PP1 in the LABORATORY 1 data differed from the driver's license number that PP1 presented to law enforcement.

purportedly administered using PP2's driver's license number for identification between August 25, 2021, and January 12, 2022, at, or through, ALVARADO's Site. Of those tests, 16 were listed under PP2's name and the remaining 31 tests were affiliated with purported minor patients. 40 of the tests affiliated with PP2 used covidtestplus@gmail.com as PP2's contact email address. PP2 stated that he/she did not recognize the names of the minor children listed as receiving tests under her/his identification information. PP2 stated that he/she has three children and provided the names of those children. PP2 stated that none of the children listed under his/her identification information in the LABORATORY 1 data were PP2's children. PP2 further stated that he/she did not use covidtestplus@gmail.com or any of the other the email addresses that were listed as PP2's contact email address.

iii.     Purported Patient 3 ("PP3") stated that, although he/she received two tests for COVID, he/she received neither of those tests at or through ALVARADO's Site. LABORATORY 1 data showed a total of 35 tests that were purportedly administered using PP3's state ID card number between September 17, 2021, and January 13, 2022, at, or through, ALVARADO's Site. Of those tests, 11 were listed under PP3's name and the remaining 24 were affiliated with purported minor patients. Nine of the tests affiliated with PP3 used covidtestplus@gmail.com as PP3's contact email address. PP3 stated that he/she did not recognize the names of the minor children listed as receiving tests under her/his identification information. PP3 stated that he/she has three adult children and four grandchildren. None of their names appeared under PP3's identification information in the LABORATORY 1 data. PP3 further stated that he/she did not use

23

covidtestplus@gmail.com or any of the other email addresses that were listed as PP3's contact email address.

iv.     Purported Patient 4 ("PP4"), who is a family member to WITNESS 2, stated that he/she did receive one COVID test from ALVARADO's Site. However, LABORATORY 1 data showed a total of 32 tests that were purportedly administered using PP4's state ID card number between August 25, 2021, and January 12, 2022, at, or through, ALVARADO's Site. Of those tests, 13 were listed under PP4's name and the remaining 19 were affiliated with six purported minor patients. PP4 stated that the purported minor patients associated with his state ID card were not his children. Further, among all tests linked to PP4, six different emails were listed as contact information of the test recipient, according to LABORATORY 1 data. None of those matched the email address that PP4 provided to investigators as his/her email address.

54.     The purported tests associated with PP4 were also linked to ALVARADO through PP4's state ID card, which was used to process all 32 tests. In particular, emails obtained via search warrant show that on September 24, 2021, PP4's state ID was emailed from oscarhalvarado@gmail.com to covidtestplus@gmail.com. Subscriber information for oscarhalvarado@gmail.com indicates that the account was registered to ALVARADO.

55.     One of the tests referenced above associated with PP4 was for purported minor patient T.P., with purported date of birth of April 6, 2016, and a purported date of service through ALVARADO's Site of November 16, 2021. This resulted in a claim by LABORATORY 2 to HRSA on or about November 29, 2021, which utilized

interstate wire communications, in the amount of $425. Of that claimed amount, HRSA paid $123.46 to LABORATORY 2.

56.     In sum, Purported Patients 1, 2, 3 all stated that they never received a COVID test at or through ALVARADO's Site.  Additionally, none of the three purported patients recognized the names or contact information listed for the minors who were purportedly associated with them.  PP4 received one COVID test through ALVARADO's Site, not 13, as represented by the LABORATORY 1 data. Additionally, PP4 did not recognize the name or contact information for the six minors who were purportedly associated with him/her. Finally, the state ID used in the fraudulent tests associated with PP4 was emailed from ALVARADO's email account to covidtestplus@gmail.com.

### H. HRSA BILLING FOR ALVARADO'S PURPORTED PATIENTS

57.     Initially, LABORATORY 1 billed HRSA directly for the PCR tests and Rapid test logs that it obtained from collection agents, including ALVARADO's Site. Later, LABORATORY 1 and LABORATORY 2 entered into an agreement that designated LABORATORY 2 as a reference lab for LABORATORY 1.[11]   HRSA data shows that LABORATORY 2 billed HRSA for tests purportedly provided to PP1, PP2, PP3, and PP4 and the minors affiliated with these individuals, as indicated in the LABORATORY 1 data. In total, HRSA paid approximately $12,593.60 to LABORATORY 2 for 100 tests associated with PP1, PP2, PP3, and PP4 and their affiliated minors between August 25, 2021, and January 12, 2022. This included the

---

[11] A reference lab submits billings to insurance providers, including HRSA, on behalf of another lab.

test purportedly administered to minor patient T.P., PP4's purported child, on or about November 16, 2021, which resulted in the HRSA claim to LABORATORY 2 on or about November 29, 2021.

## IV.    CONCLUSION

58.    Based upon the foregoing facts, I submit that there is probable cause to believe that OSCAR H. ALVARADO committed the offense of wire fraud, as alleged in the Complaint.


FURTHER AFFIANT SAYETH NOT.

*s/ Christa Varga*
Christa Varga
Special Agent
Federal Bureau of Investigation


SWORN TO AND AFFIRMED by telephone on September 12, 2023

Honorable JEFFREY I. CUMMINGS
United States Magistrate Judge